Fred CARAVEO, Plaintiff-Appellant,

v.

DUMAS–MILNER CHEVROLET CORPORATION, Defendant-Respondent.

No. 23906.

Kansas City Court of Appeals.

Missouri.

April 6, 1964.

Arthur T. Stephenson, Stephenson, Henry & Schollars, Kansas City, for appellant.

Downey, Abrams & Sullivan, Leo L. (Pat) McCormick, Kansas City, for respondent.

SPERRY, Commissioner.

Plaintiff sued defendant for damages growing out of the purchase, by him from defendant, of a new Chevrolet Station Wagon. The cause of action submitted is based upon fraud and misrepresentations. From a judgment in favor of plaintiff in the sum of $3,670.85, actual damages, and for $2,500.00, punitive damages, defendant appeals.

The facts are not in dispute. On June 10th, 1958, plaintiff visited defendant's place of business for the purpose of buying a new Chevrolet automobile. Defendant's salesman showed plaintiff a new Nomad Station Wagon, equipped with "level aire suspension". 1958 was the first year that General Motors had produced cars with level aire suspension but defendant's salesman, Hicks, told plaintiff that level aire suspension was designed to keep the body level in a way similar to the way springs would do. Plaintiff knew nothing about this feature of the car and relied on what Mr. Hicks told him. Mr. Hicks also mentioned that a warranty accompanied all new cars. Plaintiff and his wife drove the car a short distance and he agreed to buy it. As consideration therefor he traded in his 1953 Mercury automobile, subject to encumbrance, and $200.00 cash. The agreed purchase price was $3,670.85, and the balance thereof, over and above the "trade in" and the $200.00, was paid by a note, secured by chattel mortgage, payable to defendant. Defendant sold the note to G. M. A. C., a finance company.

Plaintiff accepted delivery of the car at defendant's place of business and drove it out. Plaintiff relied on defendant's salesman's representation to him that it was a new car and in good mechanical condition. He said that he would not have bought it but for those representations. A few minutes after having driven the car out of the defendant's place of business, it began smoking. He stated that he called defendant's service department and was told to close a valve and drive it to defendant's shop. He stated that the back end went up and the front end went down; that he drove it slowly to defendant's shop and was told there that the compressor had blown up; that he waited several hours while repairs were made; that within less than a week, a fan belt broke and he returned the car for repairs; that, afterward, it was just a series of fan belts, compressors, and valves; that he became afraid to drive it to his home; that, many times when the back end was up and the front end down, it would scrape gravel while going up hill; that he was constantly in the garage, sometimes at night; that such conditions continued during the entire five months that he kept the car, sometimes "two, three or four times a week; sometimes I was in there all afternoon waiting for it", that sometimes the car "was sitting to one side"; that it would sit right down on its axle; that he would have to start it up and let it run for thirty minutes to get it to rise

up so that he could operate it; that, sometimes, after leaving it at defendant's for repairs, he would get no further than a block therefrom, when a belt would come off; that this occurred on numerous occasions; that he would have to return to defendant's garage and wait for repairs.

Plaintiff stated that, after he had had the car for three weeks and had no satisfactory service from it, he suggested to defendant's salesman, Hicks, that he return the car and that defendant deliver to him his old car and rescind the transaction; that defendant refused to accede to this proposal but offered to sell plaintiff a different car if he would pay an additional $250.00; that plaintiff did not have that much money and retained the Station Wagon; and that no deal of any kind regarding a settlement was ever thereafter made or mentioned with or to defendant.

Plaintiff stated that, after he had had the car for about five months, after having made two payments on the note, and after having written to several officials of General Motors Company about its mechanical defects and its general unfitness as a motor vehicle, he notified G. M. A. C. that he would make no further payments on the mortgage and asked that the car be repossessed; that G.M.A.C. took possession of the car; that, later, demand was made upon him for payment of the entire balance of the note; that he does not know where the note is or what became of it.

A Mr. Johnson testified for plaintiff by deposition. He stated that he purchased this automobile from defendant in December, 1958, paying $3,000.00 therefor. He detailed, in several pages of testimony, the troubles he had with the automobile. In short, it performed for him in about the same unsatisfactory manner that it had operated for plaintiff. He stated that, when he bought it, the front fender was up and the back fender was down; that it was crooked; that the aire ride was out of adjustment; that defendant told him that it would take only a minor adjustment to fix it; that he later learned that it was not a minor adjustment that was needed; that defendant repaired it; that, three days later, it was sitting crooked again; that the "front fender was always up and the rear fender * * * was always down"; that this went on weekly, for from two and one half to three months; that the car was finally fixed, about three months and one week after he bought it.

Mr. Hicks, testifying for defendant, did not contradict any part of the above testimony but, on the contrary, confirmed it as a whole.

Defendant contends that the Court erred in overruling its motion for directed verdict at the close of all of the evidence. It is so urged on the grounds that plaintiff's own evidence showed an estoppel on his part to proceed against defendant in fraud after his voluntary rescission or abandonment of the contract; that his attempt to so proceed was an inconsistent remedy with his election to rescind the contract, thereby fixing not only his remedy but his damages, if any; that plaintiff, having elected to rescind, cannot later pursue a different remedy.

In this case, defendant's pleading consisted of a general denial. It did not plead estoppel, as is required by the provisions of Section 509.090, R.S.Mo., 1959, V.A.M.S. At no time, by pleading or in any other manner, did defendant suggest its reliance on estoppel as a defense, even in its motion for a new trial. It appears for the first time in the brief.

■ Defendant contends that it is not necessary to plead estoppel if the facts establishing that defense appear in plaintiff's own evidence as, it is claimed, it does appear here. It is not necessary, in this case, to rule this contention because it was not established by the evidence that plaintiff elected to rescind so as to bar an action based on fraud and misrepresentations.

It is true that plaintiff, some three weeks after the contract of sale was made, offered to return the Station Wagon if defendant would restore him to his condition prior to the consummation of the contract. But that offer was rejected by defendant, who made a counter offer, which in turn, was rejected by plaintiff. The parties, thus, remained in the same position that they occupied prior to the offer and rejection of rescission. Neither had thereby suffered any detriment. Plaintiff, *thereafter*, made two monthly payments on his note and continued fruitlessly to drive his car to defendant's shop for repairs, every few days. This conduct by plaintiff continued for more than four months following his rejected offer of rescission. He constantly sought action on the part of defendant, and from various officials of General Motors, to remedy the conditions which made the car virtually useless for the purposes for which he purchased it. Such conduct on plaintiff's part is wholly inconsistent with renunciation or rescission of the contract.

 To constitute an estoppel in pais, three things must occur: first, an admission, statement, or act inconsistent with the claim afterward asserted and sued on; second, action by the other party on the faith of such admission, statement, or act; and, third, injury to such other party, resulting from allowing the first party to contradict or repudiate such admission, statement, or act. An equitable estoppel cannot arise unless justice to the rights of others demand, its office being not to work a positive gain to a party, but to protect him from a loss which he could not otherwise escape, and hence should be limited to what is necessary to put the parties in the same relative position they would have occupied if the predicate of the estoppel had never existed. Waugh v. Williams, 342 Mo. 903, 119 S.W.2d 223, 226. Appellants position was not changed by plaintiff's offer of rescission, which was rejected; nor by his voluntary surrender of the motor vehicle to the finance com-pany. The latter action probably was to defendant's benefit, rather than to its detriment. It probably resulted in mitigating the damage to defendant. An offer to rescind the sale in this case did not exhaust plaintiff's right to elect another remedy. Marquis v. Pettyjohn, Mo.App., 212 S.W.2d 100, 104.

The judgment is affirmed.

MAUGHMER, C., concurs.

PER CURIAM:

The foregoing opinion of SPERRY, C., is adopted as the opinion of the Court.

All concur.